UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-50260
_____

SIERRA CLUB,

Plaintiff-Appellee,

and

GREEN VALLEY SPECIAL UTILITY DISTRICT, ET AL.,

Intervenors-Plaintiffs-Appellees,


versus

BRUCE BABBITT, in His Official Capacity as
Secretary of the Department of the Interior, ET AL.,

Defendants,

STATE OF TEXAS,

Intervenor-Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
(CA-MO-91-69)
_____

**************************************************************
_____

No. 95-50165
_____

SIERRA CLUB,

Plaintiff-Appellee,

GREEN VALLEY SPECIAL UTILITY, ET AL.,

Intervenors-Plaintiffs,


versus

**BRUCE BABBITT, in His Official Capacity as
Secretary of the Department of the Interior, ET AL.,**

**Defendants,**

**STATE OF TEXAS,**

**Intervenor-Defendant-Appellant.**

_____

**Appeal from the United States District Court
for the Western District of Texas
(CA-MO-91-69)**

_____

February 26, 1996

Before WISDOM, DUHÉ, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

At issue are only post-judgment matters. And, as noted previously, it is time for this litigation to end. Because the district court's appointment of a monitor was reasonable in light of the morass of post-judgment developments in this case and thus not an abuse of the court's discretion in effectuating a judgment, we **AFFIRM** both the appointment of the monitor and the assessment of a portion of his costs against Texas. However, because the relief sought in this action, the creation and dissemination of springflow information by the federal defendants, has been achieved, all other issues are moot; we **REMAND** with instructions to conclude this action.

---

[*]    Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

I.

Covering an expanse of about 3,600 square miles, the Edwards Aquifer stretches through several counties in central Texas. It is home to five species identified as either "endangered" or "threatened".[1]

In 1991, the Sierra Club filed this action against the Secretary of the United States Department of the Interior and the United States Fish and Wildlife Service (the federal defendants) pursuant to the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq*. Texas governmental entities and private water users intervened as defendants.[2]

After a bench trial in May 1993, the district court entered findings of fact and conclusions of law, and a final judgment. The court granted the relief sought by the Sierra Club in its amended complaint -- it enjoined the federal defendants to develop and disseminate information about the springflows necessary to protect the species in issue, as well as the minimum water levels in the aquifer necessary to protect them. *See **Sierra Club v. Babbitt***, 995 F.2d 571 (5th Cir. 1993). The court ordered that Texas prepare an Edwards management plan; but, it should be noted that Texas sought such an order. ***Id***. at 574, n.4.

---

[1] The species are the San Marcos salamander, the fountain darter, the Texas blind salamander, the San Marcos gambusia, and Texas wild rice.

[2] Early in the proceedings, the district court granted the State of Texas intervention of right pursuant to FED. R. CIV. P. 24(a).

Several of the intervenor defendants, as well as the federal defendants, appealed. But, when the Sierra Club agreed to certain semantic changes in the district court's findings and judgment, the federal defendants dismissed their appeal. Contending that the remaining appellants lacked standing to appeal, the Sierra Club moved to dismiss the appeal. In support, it stated to our court that its amended complaint

> considerably narrowed the relief sought, eliminating anything that could be construed as a request that the court order the Federal Defendants to limit or regulate the pumping of water from the Edwards. In particular, the Plaintiffs dropped their request for an injunction against the Federal Defendants "to require enforcement of the [ESA] to *ensure* that the natural springflow from the Comal Springs is at least the minimum required flow at all times", **retaining the more modest request that the Federal Defendants be ordered to "determine" the biologically required minimum springflows**. The amended complaints, like the original complaints, sought no relief against the Intervenor[s]-Defendants, or any party other than the Federal Defendants.
>
> ....
>
> ... In the amended pleading upon which the case below was tried Plaintiffs did not seek an order directing the [Federal Defendants] or anyone else to achieve pumping restrictions or to take any other action that will mandate pumping reductions. It therefore simply will not work for the Intervenor[s]-Defendants to imply that the Judgment below ... "impose[s] severe restrictions upon the sole, historic water supply of a major city"; or that the court below is attempting ... "to regulate groundwater pumping throughout a 3,600 square mile area" .... The Judgment below does no such thing.

(Citations omitted; emphasis in italics in original; emphasis in bold added.)

- 4 -

Agreeing with the Sierra Club, our court dismissed the appeal in August 1993. *Sierra Club v. Babbitt*, 995 F.2d 571 (5th Cir. 1993). Our court recognized that

> [t]he appellants allege numerous injuries from the district court's judgment, but we decide that the judgment and findings are of no consequence to them. On its face, the judgment orders nothing of the appellants. Nor will the judgment affect the appellants in any future litigation, because the only issue necessarily decided by the district court is that [the] *FWS* has a nondiscretionary duty to promulgate springflow information. The appellants cannot legitimately blame the judgment for causing any future litigation; the information ordered by the district court is in no wise a prerequisite to ESA-enforcement litigation.

*Id.* at 575 (emphasis in original).

In November 1993, nearly a year after the bench trial, and several months after entry of judgment, the Sierra Club moved for appointment of an expert (a "monitor") to aid the court in determining whether any state or federal plan complied with the ESA, and, if not, what action the district court should take. Relying upon its "inherent equitable power to appoint a person ... to assist it in administering a remedy", *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir.), *amended in part, vacated in part*, 688 F.2d 266 (5th Cir. 1982), *cert. denied*, 460 U.S. 1042 (1983), the court designated a monitor (Monitor Order).

After appealing the Monitor Order, the State of Texas, on behalf of the Texas Department of Agriculture (TDA), moved the district court to stay the monitor's activities, citing, *inter alia*, the assessment of costs for the monitor. In response, the

Sierra Club moved to dismiss the TDA; and the district court did so (TDA Dismissal Order).  The TDA Dismissal Order is also on appeal.

Sierra Club sought to amend its complaint to seek relief from the State of Texas in April 1995.  Although the district court granted leave to amend, our court, by writ of mandamus, overturned that grant.  Later, the Sierra Club moved our court to remand the case conditionally to allow them to again broaden the scope of this litigation.

Much of the post-judgment complication arose out of the troubled birth of a state regulatory entity, the Edwards Aquifer Authority.  The Texas legislature created the EAA in 1993 and charged it with regulating withdrawals of water from the aquifer, as well as developing a comprehensive management plan for it.  But, because the creation of the EAA implicated section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, Texas was obligated to obtain federal approval of the EAA.  It was not obtained until after the July 1995 oral argument in this appeal; this court was notified that the EAA would begin operation in late August 1995.

However, preclearance was not the sole obstacle for the EAA. A water conservation district sought injunctive relief in state court to prevent the EAA from operating, as well as a declaration that the legislation creating the EAA violated the Texas Constitution.  After imposing a temporary injunction that allowed the interim directors to be sworn in, to meet, and to defend themselves, *but not* to take any action in furtherance of their legislative mandate to regulate draws from the Edwards, the state

court in late November 1995 declared that the statute creating the EAA violated the Texas Constitution. The Texas Supreme Court has slated oral argument for early March 1996.

Dropping back to October 1995, our court, anticipating that the EAA would become operational and conduct regulatory activities capable of mooting this appeal, stayed this case and remanded for findings on justiciability. After the district court made such findings, the Sierra Club moved this court to lift the stay, so that the district court's proposed order, prepared concomitantly with its additional findings, could take effect. (That order, among other things, would have required the federal defendants to demonstrate to the district court that the FWS had "implement[ed] that recovery plan to the point at which reasonable assurance [was] provided that springflows will never again drop below jeopardy levels".) This motion and the numerous other pending motions in our court are rendered moot by this opinion.

On February 14, 1996, the FWS published the long-awaited recovery plan.[3] It includes findings by the FWS on the minimum

---

[3] The plan's publication was delayed by, *inter alia*, the government closing occasioned by the budget debate impasse of December 1995. Moreover, budgetary constraints have further impeded this process in that another agency within the Department of Interior, the National Biological Service, has proposed to close the San Marcos National Fish Hatchery and Technology Center. The hatchery has conducted research for many years concerning the species at issue and has been used as a refugium to maintain captive stocks of those species during drought times. Complicating matters, the Sierra Club sent the NBS notice of intent to sue under the ESA if the hatchery were closed. These matters had to be considered by the personnel responsible for preparing the recovery plan. (In fact, the Sierra Club filed such an action on February 13, 1996, and the district court has issued a temporary restraining order preventing the hatchery's closure.)

springflow levels needed to avoid takes under the ESA. (As noted, the lack of this information was the alleged cause of Sierra Club's injury. *Sierra Club v. Babbitt*, 995 F.2d at 574 n.5.) The plan also addresses maintaining sufficient water in the habitat. Notice of the plan is to be published in the Federal Register.

## II.

At issue are: (1) the district court's authority to appoint the monitor; (2) the assessment of part of the monitor's costs against the State of Texas; and, (3) the dismissal of the TDA. In sum, we hold that: (1) the post-judgment complications, especially the confusion over the EAA, more than justified the appointment; (2) the assessment of part of his costs against Texas, which sought to participate in preparation of a recovery plan, was proper; and (3) the dismissal of TDA, whether proper or not, is no longer a live controversy because, with the completion and notice of the federal recovery plan, the requested relief has been achieved.

## A.

As a preliminary matter, we note that we have appellate jurisdiction over the Monitor and TDA Dismissal Orders. "To be appealable, an order must be final, it must fall within the specific class of interlocutory orders made appealable by statute, or it must fall within some jurisprudential exception." *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991) (footnotes omitted).

## 1.

In *Catlin v. United States*, 324 U.S. 229 (1945), the Supreme Court defined "final decision" for purposes of appeal as "generally

... one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment". *Id.* at 233.  When appeals are taken from post-judgment orders, however, appellate courts encounter a dilemma in determining whether the order being appealed is "final".

Combining the related concepts of practical finality[4] and the collateral order doctrine[5], our court, in **United States v. McWhirter**, 376 F.2d 102 (5th Cir. 1967), recognized that the Supreme Court

> has held final and appealable ancillary orders which determine substantial rights of the parties which, if not promptly reviewed, will subject the party to irreparable harm.  In such a situation, review postponed amounts to review denied.

*Id.* at 105 (citations omitted).  The Monitor Order fits this category.

For reaching this conclusion, it is necessary to examine the scope of that post-judgment order.  In granting the Sierra Club's motion for the appointment of the monitor, the district court stated that the monitor's purpose would be to aid it

> in determining whether further relief from this Court is necessary to "avoid unlawful takings of listed species, any appreciable reduction in the likelihood of survival and recovery of listed species in the wild, and any appreciable diminution of the value of critical habitat for the survival and recovery

---

[4]    *See generally,* **Blossom v. Milwaukee & C.R.R.**, 68 U.S. 655 (1864) (establishing doctrine of practical finality in post-judgment context).

[5]    *See generally,* **Cohen v. Beneficial Indus. Loan Corp**, 337 U.S. 541 (1941).

of any listed species" caused by inadequate regulation of withdrawals from the Edwards Aquifer.

In the Monitor Order, the district court authorized the monitor to gather and analyze information regarding a wide range of matters that may affect the aquifer, as well as to monitor, on a continuing basis, *inter alia*, the efforts of the State of Texas to regulate withdrawals from it. Additionally, the district court ordered the Texas Natural Resources Conservation Commission to "correct" the plan that its predecessor had submitted previously. The order directed the monitor to inform the court if any party "fails or refuses to cooperate fully". Finally, the order remains in effect until "such time as the State of Texas implements an adequate regulatory plan or system to prevent violations of the ESA or until such other time as the Court deems proper, whichever comes first".

But, as the Sierra Club stated in the earlier appeal, the final judgment was of narrow scope and breadth, and did not involve the State of Texas. On the other hand, the Monitor Order exposes the action or inaction of the State of Texas to supervision by a court-appointed official. Thus, the order has the potential to affect substantial rights of the State. We conclude that we possess appellate jurisdiction.

2.

As for appeal from the TDA Dismissal Order, it is well-established in our circuit that the denial of a motion to intervene of right is appealable immediately as a collateral order. *E.g.*,

- 10 -

*Valley Ranch Dev. Co. v. Federal Deposit Ins. Corp.*, 960 F.2d 550, 555-56 (5th Cir. 1992); *Bush v. Viterna*, 740 F.2d 350, 351 n.1 (5th Cir. 1984). The district court's dismissal of the TDA, which had been granted intervention of right, operates effectively as a denial of such intervention. Accordingly, we have appellate jurisdiction over that order as well.

B.

The post-judgment developments in this case are made more complex by the presence of Texas as a party. Because it sought to be included in the remedy, when it sought to be ordered to develop its own plan for management of the Edwards, and then embarked on an arduous journey to create a regulatory entity, the district court cannot be faulted for appointing an expert to assist in effectuating the judgment. The confusion created by the parallel efforts of the State's legislative action and the Sierra Club's efforts to enforce the judgment more than justified the appointment of a monitor.

As stated, our court, in *Ruiz v. Estelle*, 679 F.2d at 1161, noted the long-established power of federal courts to appoint an agent to supervise the implementation of decrees. In view of the post-judgment events at play, the appointment of a monitor did not exceed the district court's power.

C.

Texas complains that it cannot be held responsible for part of the cost of enforcing the judgment, when it ordered nothing of Texas. We hold otherwise; because Texas injected itself into the

remedial process by asking to participate in the creation of its own plan for management of the Edwards, it may be held responsible for bearing a portion of the cost of the monitor.

D.

Whether TDA should have remained a party in an action that is complete and in which no relief affects TDA simply does not constitute a justiciable controversy. When it opposed the Texas appeal of the amended judgment, the Sierra Club defined the scope of the relief it sought and was granted by that judgment. Because that relief has now been obtained, as discussed below, there can be no controversy regarding whether TDA should be a party to this suit which has concluded in a manner that does not affect TDA.

After the Sierra Club amended its complaint, the defendants moved to dismiss. In response, the Sierra Club stated the limited scope of this action:

> The relief sought by the Plaintiffs in this case is really quite narrow. All Plaintiffs are seeking from this court is an order compelling the FWS to determine the biological requirements of the species within a reasonable time and to notify other interested parties of these requirements.

And, in response to the federal defendants' motion to dismiss the original complaint, the Sierra Club defined once again the limited scope of this action, declaring that

> the Sierra Club and GBRA [Guadalupe-Blanco River Authority] have deliberately sued only the Federal Defendants, and at this time seek only:
>
> (1)     findings of fact concerning the minimum springflows required to prevent takings under [the] ESA ...; and

- 12 -

> (2) an order directing the Federal Defendants to develop and implement a plan "for the conservation and survival" of the endangered species at Comal and San Marcos Springs, under [the] ESA....

Then, as discussed, the Sierra Club further limited its articulation of the relief sought by advising our court, in its motion to dismiss the appeal of the intervenor defendants, that this action had proceeded to trial on the "modest request" that the federal defendants be ordered to determine minimum springflows.

With publication of the recovery plan, the FWS has announced those springflow levels required to avoid takes under the ESA in a comprehensive plan for the conservation and survival of the species in issue. Thus, all relief sought, all that could be awarded, has been obtained through this plan.

While the judgment did order the federal defendants to "implement" the recovery plan once it was created, we conclude that "implement", in the context of this action, means simply the publication and notice of the plan. Both our understanding of the ESA and Sierra Club's assertions regarding the scope of the relief it sought support this conclusion.[6] The recovery plan is consistent with our conclusion; its "implementation schedule"

---

[6] We note that some uncertainty exists regarding the ESA's requirement that recovery plans be implemented. *See* Daniel J. Rohlf, The Endangered Species Act: A Guide to Its Protections and Implementation, 89 (1989) (noting courts have yet to interpret whether duty to implement recovery plans includes duty that Secretary must undertake activities identified in plans to conserve species). *See also* Barbara Craig, "The Federal Endangered Species Act", 38 OCT Advocate (Idaho), 12 (1994) (explaining that recovery plans are simply proposals and recommendations lacking force of law).

provides that the plan does not commit any party to "actually carry out a particular recovery task or expend the estimated funds".

If the Sierra Club wants additional relief, then it must file a new action. No amount of post-judgment paper generation can convert a judgment ordering federal defendants to create and disseminate information into a judgment enjoining Texas to restrict pumping from the Edwards. In short, the Sierra Club is stuck with the limited relief that, in the earlier appeal, it told this court it sought. If "implement" meant more, then Sierra Club should not have told this court, in that earlier appeal, that it meant only the creation and dissemination of information. This action is over.

### III.

For the reasons discussed above, the order appointing the monitor and assessing his costs is **AFFIRMED**. Because we hold that, with the publication and notice of the recovery plan, this action became devoid of any live controversy, we **REMAND** with instructions that the district court take the ministerial steps necessary to conclude this case promptly.

**AFFIRMED and REMANDED**